IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

WILFREDO MERCADO VEGA, et al.,

     Plaintiffs,

          v.                          CIVIL NO.: 08-1419 (JAG)

FRESSENIUS MEDICAL CARE, et al.,

     Defendants.

## REPORT AND RECOMMENDATION

### I.    PROCEDURAL BACKGROUND

This case arises from the November 25, 2006 death of Wilfredo Mercado Garay ("Mercado") during a routine dialysis treatment at the Auxilio Mutuo Dialysis Center, operated by defendant Bio-Medical Applications of Arecibo, Inc. ("BMA", also known as Fressenius Medical Care) (Docket No. 35; 79, ¶ 9; Docket No. 86-2, ¶ 9.) Plaintiffs Wilfredo Mercado Vega, Henry Mercado Vega, Wilfredo Mercado Reyes, and Rosa Hernández, Mercado's sons and daughter, filed a second amended complaint in the instant case on December 9, 2008 alleging two causes of action against BMA, its insurance companies, and unknown codefendants pursuant to Puerto Rico's tort statute, Article 1802 of the Puerto Rico Civil Code, P.R. Laws Ann., tit. 31, § 5141 ("Article 1802"). (Docket No. 35.) First, plaintiffs claim damages for their mental suffering as a result of their father's allegedly wrongful death; second, plaintiffs bring an inherited cause of action based on pain and suffering allegedly endured by Mercado before he died. Before the court is a motion for partial summary judgment filed by defendant BMA requesting the dismissal of plaintiffs' inherited cause of action, along with plaintiffs' opposition, BMA's reply, and plaintiffs' surreply. (Docket Nos. 78,

1

86, 91, 99.)

## II.   UNCONTESTED FACTS

At the time of his death, Mercado was a 64-year old male with a history of type II diabetes mellitus, hypertension, and end stage renal disease requiring renal replacement therapy, who had been undergoing hemodialysis three times per week since June 13, 2002. (Docket No. 79, ¶¶ 8, 9; Docket No. 86-2, ¶¶ 8, 9; Docket No. 79-3 at 1.)  On November 25, 2006, as usual, Mercado arrived at defendant's dialysis clinic with his wife, Rosa Vega. (Docket No. 79, ¶ 16; Docket No. 86-2, ¶ 16; Docket No. 79-3 at 1; Docket No. 82-3 at 23; Docket No. 82-4 at 18; Docket No. 95-3 at 5.)  There were at least seven nurses on duty that morning working the 6:00 a.m. to 2:00 p.m. shift.  (Docket No. 79, ¶¶ 4, 26, Docket No. 86-2, ¶¶ 4, 26; Docket No. 82-3 at 2; Docket No. 95-3 at 11-14.) Mercado began his routine dialysis at 6:15 a.m., and his vital signs were checked again at 6:45, 7:15, 7:45, and 8:15. (Docket No. 79, ¶ 33; Docket No. 86-2, ¶ 33; Docket No. 79-8 at 1.)

At approximately 9:15 a.m., the nurse in charge of Mercado noticed that he was unresponsive. At 9:20 a.m., a distress code was called and at least five nurses quickly began administering CPR, strictly following protocol.  Dr. Angel Sánchez Martínez ("Dr. Sánchez"), Mercado's nephrologist, arrived while the nurses were administering CPR and observed blood on the floor, which the nurses indicated belonged to Mercado.  According to Dr. Sánchez, there was no indication of what had caused the hemorrhage.  At 10:00 a.m., after 40 minutes of CPR had not restored Mercado's normal or stable vital signs, Dr. Sánchez ordered the CPR stopped and pronounced Mercado dead.  Mercado's death certificate states that his immediate causes of death were cardiac arrest, hemorrhage, and renal failure. (Docket No. 79, ¶¶ 35, 36, 40-48, 51; Docket No. 86-2, ¶¶ 35, 36, 40-48, 51; Docket No. 79-3 at 2; Docket No. 79-11; Docket No. 82-3 at 7-8, 10-12,

15; Docket No. 82-4 at 10; Docket No. 82-5 at 11-15; Docket No. 82-6 at 2; Docket No. 95-5 at 2.)

Mercado's medical record contains an informed consent form, bearing his signature on each page, which details the complications associated with the dialysis procedure and the responsibilities of the dialysis patient during, before and after undergoing dialysis. The form describes measures patients should undertake to ensure a safe dialysis, including maintaining visibility of the catheter, staying alert and awake throughout the dialysis, and reporting any discomfort or suspected problem with the connection of the blood line. (Docket No. 79, ¶ 11; Docket No. 86-2, ¶ 11; Docket No. 82-2; Docket No. 79-3 at 2.) Mercado, like other patients, had been given training as to what to do if his intravenous line became disconnected, including stopping the pump, closing the line, and immediately calling out for help. He had the muscular strength to stop the pump and hold the line. (Docket No. 79, ¶ 55; Docket No. 86-2, ¶ 55; Docket No. 82-5 at 16-17.)

The medical record from the morning of Mercado's death contains no descriptions of complaints, expressions of pain, or other signs of distress before he was found unresponsive or during the administration of CPR. (Docket No. 79, ¶ 49; Docket No. 86-2, ¶ 49; Docket No. 79-8; Docket No. 79-9; Docket No. 79-11.) Other patients received dialysis in the clinic during the morning of November 25, 2006, but they did not notice that anything was wrong with Mercado or hear him complain or call for help. (Docket No. 79, ¶¶ 53-54; Docket No. 86-2, ¶¶ 53-54; Docket No. 82-3 at 16-18; Docket No. 82-4 at 18; Docket No. 82-5 at 18.) Neither Dr. Sánchez nor any of the nurses deposed testified that they observed Mercado exhibit signs of pain or suffering before he died. (Docket No. 79, ¶¶ 28-32, 39, 56; Docket No. 86-2, ¶¶ 28-32, 39, 56; Docket No. 82-3 at 3-6, 21-22, 25; Docket No. 82-4 at 3, 4, 9, 15-19; Docket No. 82-5 at 16-17.)

### III.   LEGAL ANALYSIS

#### A. Summary Judgment Standard

Summary judgment may be entered only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.  A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law.'" Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52. (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In order to defeat a properly supported motion for summary judgement, the opposing party must present more than a mere scintilla of "'definite, competent evidence'" demonstrating that a trial-worthy issue exists. Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994) (quoting Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1993)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). For issues where the opposing party bears the ultimate burden of proof, that party cannot merely "rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Suárez, 229 F.3d at 53 (quoting McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)).

In assessing a motion for summary judgment, the court "must view the entire record in the

light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citing Rossy v. Roche Prod., Inc., 880 F.2d 621, 624 (1st Cir. 1989)). However, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be)." Greenburg v. P. R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987).

## A. Plaintiffs' Inherited Tort Actions under Article 1802

Puerto Rico law provides for the survivorship of tort actions. Widow of Delgado v. Boston Ins., 1 P.R. Offic. Trans. 823 (1973). Thus, Mercado's heirs inherited his right to bring a cause of action in tort for any pain and suffering he experienced prior to his death. See id.; Marrero Artache v. Autoridad de Energía Eléctrica, 924 F. Supp. 346, 348 (D.P.R. 1996). However, if Mercado "died . . . without suffering or experiencing the apprehension of his imminent death, he 'did not possess, not even for a second, the right to recover damages.'" Marrero Artache, 924 F. Supp. at 348 (quoting Zeno Molina v. Vázquez Rosario, 6 P.R. Offic. Trans. 462 (1977)). In evaluating any damages, the court considers, among other things, "the nature and duration of the injuries; the time elapsed between the actual damage and the death; [and] the degree of lucidity or consciousness of the victim." Publio Díaz v. Puerto Rico, 6 P.R. Offic. Trans. 1173 (1973). Thus, to succeed on their inherited cause of action, plaintiffs must present "definite, competent evidence" to show that

Mercado suffered before he died.[1]  See Maldonado-Denis, 23 F.3d at 581.

Plaintiffs readily admit that there is no direct evidence that Mercado suffered before he died, and in their opposition to BMA's motion for summary judgment, plaintiffs do not submit a statement of proposed contested facts.  Instead of presenting factual evidence to show that Mercado suffered, plaintiffs' opposition is dedicated to impugning BMA's evidence, arguing that BMA is "covering up the truth of what really happened." (Docket No. 86 at 9.)  Plaintiffs' principal argument is that the medical record was manipulated for two reasons.  First, Dr. Sánchez testified that when he left the dialysis clinic after Mercado died on November 25, 2006, he signed all available pages in the medical record for that date, and yet the medical record contains pages bearing that date which do not bear his signature. (See Docket No. 95-2 at 9-11; Docket No. 94-5; Docket No. 95-5; Docket No. 86-5; Docket No. 86-6.)  BMA contends that some of the pages were completed that day after Dr. Sánchez left the clinic, and that Dr. Sánchez need not sign all of the records because some pertain to the Hospital and some pertain to BMA, a different entity.  Second, the record contains two nurse's notes dated November 25, 2006, drafted at the same time, 9:15 a.m., by the same nurse. (Docket No.  86 at 8-9 (citing Docket No. 95-4; Docket No. 95-5.))  One of the notes has several crossed out sections, and the other note is clearly written and bears a slightly different description of the events at the time, although both notes state that the nurse returned from breakfast and found Mercado unresponsive, and that the staff then followed protocol.  BMA contends that the struck-through note is a "redacted" first iteration, that the clean second note was the final version, and that,

---

[1] In the context of legal argumentation regarding inherited claims under Article 1802, defendant (e.g., Docket No. 78 at 6) and plaintiffs (e.g., Docket No. 86 at 15-16) cite to Cintrón Adorno v. Gómez, 147 D.P.R. 576 (1999).  Because this case is written in Spanish and a certified translation has not been provided, the court cannot consider this case in its analysis.  See Puerto Ricans for P.R. Party v. Dalmau, 544 F.3d 58, 67 (1st Cir. 2008) (stating that where a party makes a dispositive motion "based on a decision that was written in a foreign language, the party must provide the district court with and put into the record an English translation of the decision.")).

if anything, the fact that both notes were included in the medical record supports the inference that the medical record is unabridged. Moreover, the struck-through sections of the "redacted" note do not indicate that Mercado showed any signs of suffering; they indicate that he is unresponsive. Plaintiffs argue that these inconsistencies "add suspicion" to their theory that BMA is covering up the truth. However, this argument boils down to speculation, and plaintiffs' other arguments also fail to directly address said substantive factual issue. For instance, plaintiffs point out an inconsistency between the time nurse Maria Concepción testified that she ate breakfast, between 8:30 a.m. and 9:00 a.m., and the designated breakfast break times articulated by nurse Yolanda Sánchez, which began at 9:00 a.m. (Docket No. 86 at 9-10 (citing Docket No. 95-6 at 4-5; Docket No. 95-7 at 4-5).) Plaintiffs also criticize the report submitted by BMA's expert, Dr. Julio E. Benabe, M.D., as "rest[ing] on half truths and not the entire facts of this case," because he did not consider, among other things, the testimony of Rosa Vega, Mercado's wife, who, BMA argues, cannot testify as to Mercado's suffering because she did not observe him after he began his dialysis. (Docket No. 86 at 14; see Docket No. 79-3.)[2] In addition, plaintiffs emphasize that some of BMA's employees who were on duty the morning of Mercado's death were subsequently reprimanded for not following company policy regarding medical records.[3] (Docket No. 86 at 12 (citing Docket No.

---

[2]Although there is evidence that Rosa Vega was at the hospital cafeteria, as opposed to the clinical area where Mercado was undergoing dialysis, (Docket No. 95-3 at 11-14), neither plaintiffs nor defendant cite to any sworn statement or statement under penalty of perjury clarifying whether Rosa Vega was able to observe or listen to her husband between 6:15 a.m. and 9:15 a.m. (See Docket No. 79; Docket No. 86-2; Docket No. 91-6; Docket No. 99.) It is only at defendant's "Reply to Opposing Statement of Uncontested Material Facts" that defendant suggests that Rosa Vega was not in Mercado's presence between 6:15 a.m. and 9:15 a.m. on the date of his death. (Docket No. 91 at 6; Docket No. 91-6, ¶¶ 5, 27.) Nonetheless, plaintiffs do not dispute this assertion in their subsequent surreply, and they still fail to bring to the court's attention any evidence from Rosa Vega stating that she heard or saw her husband suffering on the day he died. (Docket No. 99.)

[3]Plaintiffs also cite a document written in Spanish for the proposition that two of BMA's employees were fired after Mercado's death. (See Docket No. 86-10.) This document has not been translated. Accordingly, the court has not taken it into account. See Local Rule 5(g).

86-9 at 7.)) Furthermore, they cite deposition testimony from Dr. Sánchez that calls into question whether BMA's "linen policy" provision requiring patients' line access points to remain visible was followed the morning of Mercado's death. (Docket No. 86 at 13 (<u>citing</u> Docket No. 86-11; Docket No. 95-2.)) Finally, they compare the deposition testimony of Ivonne Ramírez, clinical manager of the dialysis unit, with the deposition testimony of Rosa Vega and conclude that the number of nurses in the unit at the time of Mercado's death also failed to comply with BMA policy.  (Docket No. 86 at 13 (<u>citing</u> Docket No. 86-9 at 5-6); <u>see</u> Docket No. 95-3.)  Indulging in all reasonable inferences in plaintiffs' favor, none of these arguments provide a hint of competent evidence to show that Mercado suffered at all prior to his death.

On the other hand, defendant BMA has pointed to factual evidence showing that there is no indication that Mercado suffered before he died.  No fellow patients in the dialysis clinic the morning of Mercado's death noticed Mercado complaining or suffering in any way.  (Docket No. 79, ¶¶ 53-54; Docket No. 86-2, ¶¶ 53-54; Docket No. 82-3 at 16-18; Docket No. 82-4 at 18; Docket No. 82-5 at 18.)  Indeed, Dr. Sánchez testified that it "was strange that nobody noticed." (Docket No. 82-5 at 13.)  No nurses or doctors testified that Mercado suffered. (Docket No. 79, ¶¶ 28-32, 39, 56; Docket No. 86-2, ¶¶ 28-32, 39, 56; Docket No. 82-3 at 3-6, 21-22, 25; Docket No. 82-4 at 3, 4, 9, 15-19; Docket No. 82-5 at 16-17.)  No medical records indicate that Mercado suffered.  (Docket No. 79, ¶ 49; Docket No. 86-2, ¶ 49; Docket No. 79-8; Docket No. 79-9; Docket No. 79-11.)  Moreover, BMA's medical expert, who evaluated Mercado's medical record, states that "there is no evidence that the patient suffered unbearable pain or stress, during the final moments of his life, as sustained by [plaintiffs]." (Docket No. 79, ¶ 50; Docket No. 86-2, ¶ 50; Docket No. 79-3 at 2, 5.)

Plaintiffs have not countered with any direct evidence that Mercado suffered, nor have they

presented an expert of their own.[4]  Rather, plaintiffs make much of inconsistencies in the evidence about the number of nurses in the clinic at the time of Mercado's death[5] and about the morning's medical records, issues which do not bear directly on the substantive factual issue of whether or not Mercado suffered.  In particular, plaintiffs focus on the dearth of evidence as to what happened to Mercado between 8:15 a.m., when his vital signs were last checked, and 9:15 a.m., when he was found unresponsive, suggesting that the very absence of evidence from that time period is enough for a jury to rationally infer that Mercado suffered before he died.[6]

Plaintiffs' attempt to surmount defendant BMA's summary judgement motion through unsupported speculation and reliance on the absence of competent evidence will not suffice.  See Suárez, 229 F.3d at 53; Medina-Muñoz, 896 F.2d at 8.  They have failed to present evidence demonstrating that a trial-worthy issue of fact exists as to whether Mercado suffered any pain before he died.  Therefore, plaintiffs' inherited cause of action should be dismissed.

**IV.    CONCLUSION**

For the reasons stated above, it is recommended that defendant BMA's motion for partial

---

[4]The most significant facts supporting a inference that Mercado suffered are that his blood was on the floor and hemorrhage was listed as a cause of death.  However, even though the quantity of blood was described as "great" by Dr. Sánchez and BMA's expert noted descriptions of "severe" blood loss, these facts by themselves are insufficient to defeat defendant's motion for summary judgment, especially in light of the fact that no expert has indicated that hemorrhage alone is an indication of conscious suffering prior to death. (Docket No. 82-5 at 13; Docket No. 79-3 at 2.)  Indeed, BMA's expert, who explicitly noted that "a pool of blood was noticed to run down the side of [Mercado's] dialysis chair to the floor," concluded that there is no evidence that Mercado suffered unbearable pain or stress during the final moments of his life. (Docket No. 79-3 at 2, 5.)  Likewise, there is no expert opinion on the record concluding that Mercado's other causes of death specified in his death certificate, namely cardiac arrest and renal failure, are indicative that Mercado suffered prior to his death.

[5]According to Yolanda Sánchez, one of the nurses on duty that morning, there were ten nurses working the 6:00 a.m. to 2:00 p.m. shift, although Rosa Vega remembers only seven nurses. (Docket No. 79, ¶¶ 4, 26, Docket No. 86-2, ¶¶ 4, 26; Docket No. 82-3 at 2; Docket No. 95-3 at 11-14.)

[6]To the contrary, two nurses testified that they saw Mercado sleeping at different points between 9:00 a.m. and 9:30 a.m. (Docket No. 79, ¶¶ 28-32, 39; Docket No. 86-2, ¶¶ 28-32, 39; Docket No. 82-3 at 3-6, 21-22; Docket No. 82-4 at 3, 4, 9-10, 15-19; Docket No. 95-2 at 7-8.)

summary judgment (Docket No. 78) be GRANTED and plaintiffs' inherited cause of action under Article 1802 be DISMISSED.

IT IS SO RECOMMENDED.

The parties have fourteen (14) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this order. Fed. R. Civ. P. 72(b); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4, 6-7 (1st Cir. 1986).

In San Juan, Puerto Rico, this 23rd day of August, 2010.

s/ Marcos E. López
U.S. MAGISTRATE JUDGE